IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01406-KLM

HECTOR ARMANDO GIL-LEYVA,

    Petitioner,

v.

SHENOA TALEESE LESLIE,

    Respondent.
_____

**ORDER**
_____

**ENTERED BY MAGISTRATE JUDGE KRISTEN L. MIX**

This matter is before the Court on Petitioner Hector Armando Gil-Leyva's **Amended Complaint** [#22][1] seeking the immediate return of his minor children to Canada pursuant to The Convention on the Civil Aspects of International Child Abduction, done at The Hague on October 25, 1980 (the "Hague Convention"), and its implementing statute, the International Child Abduction Remedies Act ("ICARA"), 22 U.S.C. § 9001 et seq. For the reasons described herein, the request is **GRANTED**.

**I. Background**

The following facts are uncontested. Petitioner Hector Armando Gil-Leyva ("Mr. Gil-Leyva"), who proceeds as a pro se litigant in this action,[2] is a citizen of Canada.

---

[1] "[#22]" is an example of the convention the Court uses to identify the docket number assigned to a specific paper by the Court's case management and electronic case filing system (CM/ECF). This convention is used throughout this Order.

[2] The Court must construe the filings of pro se litigants liberally. *See Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). However, the

-1-

Respondent Shenoa Taleese Leslie ("Ms. Leslie") is a citizen of the United States. Mr. Gil-Leyva and Ms. Leslie were never formally married. *Am. Compl.* [#22] ¶ 5; *Answer* [#52] ¶ 5. They lived together in the District of Colorado starting in March 2008, and around September 2009, they relocated to Canada. *See Tr.* [#46] at 71. Mr. Gil-Leyva and Ms. Leslie are the biological parents of two children together, HMG and HFG. *Am. Compl.* [#22] ¶ 5; *Answer* [#52] ¶ 5. At the time this action was commenced on June 9, 2017, HMG was five years old and HFG was two years old. *Am. Compl.* [#22] ¶¶ 7-8; *Answer* [#52] ¶¶ 7-8. Both children were born in Canada. *Id.*

On May 29, 2016, Mr. Gil-Leyva authorized Ms. Leslie to take the children on a visit to Colorado for less than two weeks. *Am. Compl.* [#22] ¶¶ 23-24; *Answer* [#52] ¶¶ 23-24. On June 5, 2016, Ms. Leslie told Mr. Gil-Leyva that she did not intend to return by the agreed-upon date. *Am. Compl.* [#22] ¶ 26; *Answer* [#52] ¶ 26. Neither Ms. Leslie nor the children have returned to Canada since that time. On October 10, 2016, Ms. Leslie told Mr. Gil-Leyva of her final decision not to return to Canada with the children. *Am. Compl.* [#22] ¶ 28; *see also Compl.* [#1] ¶ 28.[3]

Mr. Gil-Leyva filed the current action on June 9, 2017, within one year of Ms. Leslie's

---

Court should not be the pro se litigant's advocate, nor should the Court "supply additional factual allegations to round out [the pro se litigant's] complaint or construct a legal theory on [his] behalf." *See Whitney v. New Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) (citing *Hall*, 935 F.2d at 1110). In addition, pro se litigants must follow the same procedural rules that govern other litigants. *Nielson v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994).

[3] A complaint submitted by a pro se litigant may be treated as an affidavit and used as evidence if the complaint is sworn, dated, and signed under penalty of perjury pursuant to 28 U.S.C. § 1746. *See, e.g.*, *Chytka v. Wright Tree Serv., Inc.*, No. 11-cv-00968-REB-KLM, 2012 WL 7151207, at *1 n.3 (D. Colo. Nov. 13, 2012). Here, Mr. Gil-Leyva's initial Complaint [#1] meets those requirements, and the Court may therefore treat it as an affidavit. Although Ms. Leslie denied this allegation in her Answer [#52] ¶ 28, she did not provide any testimony at the hearing and has not otherwise provided evidence in opposition to this fact.

final decision not to return HMG and HFG to Canada. Mr. Gil-Leyva seeks an order from this Court requiring Ms. Leslie to return HMG and HFG to Canada, pursuant to the Hague Convention and the ICARA. On January 10, 2018, the Court held a hearing on the Complaint. Mr. Gil-Leyva appeared by telephone pro se, and Ms. Leslie appeared in person and with counsel.

## II. Legal Standard

Both the United States and Canada are signatories to the Hague Convention. The Hague Convention "creates an international legal mechanism requiring contracting states to promptly return children who have been wrongfully removed to, or wrongfully retained in, their jurisdiction, without deciding anew the issue of custody." *Navani v. Shahani*, 496 F.3d 1121, 1124 (10th Cir. 2007). ICARA states that "[c]hildren who are wrongfully removed or retained within the meaning of the Convention are to be promptly returned unless one of the narrow exceptions set forth in the Convention applies." 22 U.S.C. § 9001(a)(4).

The Convention "was especially aimed at the unilateral removal or retention of children by those close to them, such as parents, guardians, or family members." *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005). "[T]he Convention seeks 'to prevent parents from abducting children in order to avoid the jurisdiction of courts with whose [custody] rulings they do not or believe they will not agree.'" *West*, 735 F.3d at 929 (quoting *Shealy v. Shealy*, 295 F.3d 1117, 1121 (10th Cir. 2002)). In other words, "[t]he principal aims of the Convention are to 'prevent an international version of forum-shopping,' 'defeat attempts to re-litigate custody matters,' and 'facilitate custody adjudications, promptly and exclusively' in the child's country of residence[.]" *See id.* (citing *Navani*, 496 F.3d at 1128-

29; *Chafin v. Chafin*, 568 U.S. 165, 180 (2013)).

In short, the Court is simply not authorized to address the merits of an underlying custody claim. *See* 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims."). The Court's scope of inquiry is limited to the merits of the removal or retention claim, in other words, whether the respondent's removal or retention of the children was "wrongful" under the Hague Convention. Importantly, the Court emphasizes that the question of which parent would be a better custodian for the children is not before this Court. *See De Silva*, 481 F.3d at 1282. "Once a petitioner establishes that removal was wrongful, the child must be returned unless the respondent can establish a defense." *Id.* at 1285. The Convention enumerates four defenses in Articles 12, 13 and 20, as discussed further below.

### III. Analysis

**A.     Jurisdiction**

As a preliminary matter, the Court finds it has subject matter jurisdiction over the claims at issue in this lawsuit. *See* 22 U.S.C. § 9003(a) ("The courts of the States and the United States district courts shall have concurrent original jurisdiction of actions arising under the Convention."); 28 U.S.C. § 1331 ("The district courts shall have original jurisdiction of all civil actions arising under the . . . treaties of the United States."); *West v. Dobrev*, 735 F.3d 921, 924 (10th Cir. 2013) ("ICARA provides federal district courts with original jurisdiction (concurrently with state courts) over petitions seeking the return of children under the Hague Convention.").

**B.   Prima Facie Case**

To establish a prima facie case of wrongful retention, Mr. Gil-Leyva must establish: (1) the children habitually resided in Canada at the time of the retention; (2) the retention breached his custody rights under the law of Canada, and (3) he was exercising those rights at the time of retention.  *West*, 735 F.3d at 929; *De Silva v. Pitts*, 481 F.3d 1279, 1281 (10th Cir. 2007).  Mr. Gil-Leyva has the burden of proving that the children have been wrongfully retained within the meaning of the Convention by a preponderance of the evidence, i.e., that the evidence, considered in light of all the facts, proves that something is more likely so than not.  22 U.S.C. § 9003(e)(1)(A); *Metro. Stevedore Co. v. Rambo*, 521 U.S. 121, 137 n.9 (1997).

    **1.   Habitual Residence**

The Court finds that HMG and HFG were habitual residents of Canada at the time of their removal.

The term "habitual residence" is defined by neither the Hague Convention nor the ICARA.  *Stead*, 77 F. Supp. 3d at 1034 (citing *Holder v. Holder*, 392 F.3d 1009, 1015 (9th Cir. 2004)); *Rydder v. Rydder*, 49 F.3d 369, 373 (8th Cir. 1995); *In re Prevot*, 59 F.3d 556, 560 (6th Cir. 1995).  "[A] child's habitual residence is defined by examining specific facts and circumstances and is a term courts should not interpret technically or restrictively."  *Kanth v. Kanth*, 232 F.3d 901 (10th Cir. 2000) (Table).  In the case of a young child, "the conduct, intentions, and agreements of the parents during the time preceding the abduction are important factors to be considered."  *Id.*  The Court "looks first to the shared intent or settled purpose of the persons entitled to determine the child's permanent home; as a secondary factor, [it] may consider the child's acclimatization to his or her current place of

residence." *Mertens v. Kleinsorge-Mertens*, 157 F. Supp. 3d 1092, 1103 (D.N.M. 2015) (citing *Mendez v. May*, 778 F.3d 337, 344 (1st Cir. 2015); *Smedley v. Smedley*, 772 F.3d 184, 186 (2d Cir. 2014); *Berezowsky v. Ojeda*, 765 F.3d 456, 466 (5th Cir. 2014)).

There is no dispute that both children were born in Canada, that HFG never left Canada prior to May 2016, and that HMG only left Canada for periods of less than two weeks prior to May 2016. *See Tr.* [#46] at 77-78. The Court therefore has no trouble concluding that HMG and HFG were both habitual residents of Canada, and that Mr. Gil-Leyva has established the first element of his prima facie case by a preponderance of the evidence.

### 2. Breach of Custodial Rights

Next, the Court finds that the retention was in breach of Petitioner's custody rights under Canadian law.

The Hague Convention's provisions on the Civil Aspects of International Child Abduction define "rights of custody" as those rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence. Here, there was no formal custody agreement between Mr. Gil-Leyva and Ms. Leslie as to HMG or HFG at the time of retention.[4] *Compl.* [#1] ¶ 50. When no formal custody agreement exists between the parents, the Court must apply the laws of the country of the child's habitual

---

[4] Ms. Leslie testified that, prior to leaving in May 2016, she initiated legal "proceedings in Canada related to the custody of the children," but she withdrew from the action prior to their completion. *Tr.* [#46] at 125. She clarified: "I believe it was asked if there was a custody proceeding in Alberta, and there was not, because all that was ever filed was a request for abridgement of service. The actual case for parental rights was not filed in Alberta." *Id.* at 126. Regardless of the precise history of proceedings in Canada, it is clear that no formal custody agreement existed between Ms. Leslie and Mr. Gil-Leyva, either by mutual agreement or by court order.

residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention. *See e.g., Sealed v. Sealed*, 394 F.3d 338, 343 (5th Cir. 2004) (when no formal custody agreement exists between the parents, courts must apply the laws of the country of the child's habitual residence to determine if the non-removing parent had "rights of custody" within the meaning of the Convention).

In his Complaint [#1] to the Court,[5] Mr. Gil-Leyva cites to the Alberta Family Law Act which, he argues, sets forth the powers, responsibilities and entitlements of guardianship and thus provide his custody rights. Specifically, Mr. Gil-Leyva cites to the Alberta Family Law Act, SA c F–4.5, to argue that, under Canadian law, in the absence of a custody order (which, as noted, did not exist here at the time of the children's removal and retention), each Canadian parent has equal or joint custody rights as to the child. The Court has reviewed the authorities cited and it appears that they support Mr. Gil-Leyva's assertion of custody rights as to HMG and HFG under Canadian law, and Ms. Leslie has not made any argument that the Alberta Family Law Act does not apply. *See also Tr.* [#46] at 68 (orally arguing that Mr. Gil-Leyva failed to demonstrate the requirements of the Alberta Family Law Act, not that the Albert Family Law Act does not apply at all); *see also id.* (denying Ms. Leslie's motion to dismiss based on argument that Mr. Gil-Leyva failed to demonstrate that he acted as a parent and did things that parents would do, as required under the Alberta Family Law Act).

Therefore, given the facts of this case and the provisions of the Alberta Family Law

---

[5] Although the Amended Complaint [#22] is the live complaint in this action, the Court stated at the January 10, 2018 hearing that it would take judicial notice of the original Complaint [#1] and Plaintiff's legal arguments made therein. *Tr.* [#46] at 29.

Act cited by Mr. Gil-Leyva, the Court finds that Mr. Gil-Leyva has shown by a preponderance of evidence his custodial rights to HMG and HFG under Canadian law.

### 3. Exercise of Custodial Rights

Finally, the Court finds that Mr. Gil-Leyva was exercising his custodial rights at the time of removal.

The evidence demonstrates that he and Ms. Leslie lived together in a romantic relationship in Canada, including after the birth of the children, for approximately six or seven years before the children's removal to the United States on May 29, 2016. *See Tr.* [#46] at 23; 76. Evidence has not been presented that Mr. Gil-Leyva was not exercising his joint rights as a parent at the time of the retention. *See, e.g.*, *Crane*, 2017 WL 4079406, at *5. Accordingly, the Court finds that this Mr. Gil-Leyva has met his burden by a preponderance of the evidence on this third and final element of his prima facie.

Thus, the Court concludes that Mr. Gil-Leyva has set forth sufficient facts by a preponderance of the evidence to establish a prima facie case of the wrongful retention of his children HMG and HFG in the United States under the Hague Convention and ICARA.

### B. Affirmative Defenses

Because Mr. Gil-Leyva has successfully demonstrated a prima facie case of wrongful retention, the children must be returned to Canada unless Ms. Leslie can establish one of the four exceptions, or defenses, set forth in the Hague Convention. *See Crane*, 2017 WL 4079406, at *5. Two of these defenses must be established by a preponderance of the evidence: (1) the proceeding was commenced more than one year after the removal of the children and the children have become settled in their new environment (Hague Convention, Art. 12) or (2) the person seeking return of the children either consented to or

subsequently acquiesced in the retention (Hague Convention, Art. 13).  *Id.*  The other two defenses require a showing of clear and convincing evidence: (1) there is a grave risk that the return of the children would expose them to physical or psychological harm (Hague Convention, Art. 13b) or (2) the return of the children would not be permitted by the fundamental principles of the requested State relating to the protection of human rights and fundamental freedoms (Hague Convention, Art. 20).  *Id.*; *see* 22 U.S.C. § 9003(e).

Ms. Leslie asserts two of these affirmative defenses: (1) consent and acquiescence, and (2) grave risk that the return of the children would expose them to physical or psychological harm.  *Answer* [#52] at 6.  "All four of these exceptions are 'narrow.'  They are not a basis for avoiding return of a child merely because an American court believes it can better or more quickly resolve a dispute.  In fact, a federal court retains, and should use when appropriate, the discretion to return a child, despite the existence of a defense, if return would further the aims of the Convention."  *Crane*, 2017 WL 4079406, at *6 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1067 (6th Cir. 1996) (internal citations omitted)).

1. **Consent and Acquiescence**

Regarding the defense of consent and acquiescence, the record is clear that Mr. Gil-Leyva consented to allow Ms. Leslie to take the children for a trip of less than two weeks from Canada to Colorado in May 2016.  *See, e.g.*, *Tr.* [#46] at 99 (stating that Mr. Gil-Leyva consented so that Ms. Leslie could see her ill mother, and that she told him by telephone after she got to Colorado that she was not going back).  Ms. Leslie has not identified a conversation in which Mr. Gil-Leyva consented or subsequently acquiesced to the permanent removal of his children to the United States.  Taken in context of the facts as

a whole, the evidence is clear that Mr. Gil-Leyva only agreed to the temporary removal of his children to the United States on a short-term basis, and there is no evidence that he would have permitted Ms. Leslie to take them out of Canada if he had known that she was not going to bring them back after what was purported to be a short visit. Regardless, in any event, Ms. Leslie has failed to establish this defense by a preponderance of the evidence, as required. *See Crane*, 2017 WL 4079406, at *6.

### 2. Grave Risk of Exposure to Harm

Regarding Ms. Leslie's defense that there is a grave risk that the return of the children would expose them to physical or psychological harm, the evidence is mixed, but the burden is on Ms. Leslie to demonstrate by clear and convincing evidence[6] that there is a grave risk that the return of the children would expose them to physical or psychological harm "or otherwise place the child in an intolerable situation." *Crane*, 2017 WL 4079406, at *5; *West v. Dobrov*, 735 F.3d 921, 931 (10th Cir. 2013). "Grave risk" means that the "potential harm to the child must be severe, and the level of risk and danger . . . very high." *West*, 735 F.3d at 931 (quoting *Souratgar v. Lee*, 720 F.3d 96, 103 (2d Cir. 2013)).

The Tenth Circuit Court of Appeals has not definitively answered the question of what a respondent must show to establish a "grave risk" to a child under Article 13(b) of the Hague Convention. *West*, 735 F.3d at 931. However, the Court of Appeals has noted:

> The Second, Third, and Sixth Circuits have stated a child is exposed to a "grave risk" of harm within the meaning of Article 13(b) in at least two

---

[6] "Clear and convincing evidence" is evidence that "creates in the fact finder's mind an abiding conviction that the truth of a factual contention is highly probable." *Colorado v. New Mexico*, 467 U.S. 301, 316 (1984).

instances. First, a court generally should not order the return of a child to a
zone of war, famine, or disease. Second, a court should not order the return
of a child in cases of serious abuse or neglect, or extraordinary emotional
dependence when the country of habitual residence for whatever reason may
be incapable or unwilling to give the child adequate protection. *See Baxter
v. Baxter*, 423 F.3d 363, 373 (3d Cir. 2005); *Blondin v. Dubois*, 238 F.3d 153,
162 (2d Cir. 2001); *Friedrich v. Friedrich*, 78 F.3d 1060, 1069 (6th Cir. 1996);
*but see Baran v. Beaty*, 526 F.3d 1340, 1348 (11th Cir. 2008) (declining to
impose on a respondent "a duty to prove that [a] child's country of habitual
residence is unable or unwilling to ameliorate the grave risk of harm which
would otherwise accompany the child's return"); *Van De Sande v. Van De
Sande*, 431 F.3d 567, 571 (7th Cir. 2005) ("The rendering court must satisfy
itself that the children will in fact, and not just in legal theory, be protected if
returned to their abuser's custody.").

*Id.* at 931 n.8.

The first type of "grave risk" regarding war, famine, or disease is not at issue here. The second type of "grave risk" requires a showing that the petitioner has engaged in "a sustained pattern of physical abuse and/or a propensity for violent abuse." *Ermini v. Vittori*, 758 F.3d 153, 164 (2d Cir. 2014). "Sporadic or isolated incidents of physical discipline directed at the children, or limited incidents of abuse directed at others and witnessed by the children are not sufficient." *Warren v. Ryan*, No. 15-cv-00667-MSK-MJW, 2015 WL 3542681, at *4 (D. Colo. June 5, 2015) (citing *Souratgar*, 720 F.3d at 104).

> It is important to recognize that the focus of the "grave risk" exception is on
> the risk of harm to the children. A showing of the petitioning parent's physical
> or emotional abuse of the respondent parent is not enough, of itself, to
> establish a risk of abuse or harm to the children. However, where the
> violence directed towards the respondent parent is not sporadic or isolated
> and occurs in the presence of the children, such abuse might establish the
> "grave risk" exception.

*Warren*, 2015 WL 3542681, at *5 (internal citations omitted).

Turning first to abuse of the children, Ms. Leslie testified that sometimes Mr. Gil-Leyva would get angry and throw things around, although he never hit the children with

-11-

those items, to her knowledge.  *Tr.* [#46] at 83.  She further testified that he spanked both children on their bare bottoms with an open hand, leaving marks.  *Id.* at 89.  She witnessed the younger child being spanked only once and the older child being spanked approximately six times.  *Id.*

Turning next to Ms. Leslie's allegations of that Mr. Gil-Leyva was neglectful, the Court first notes that Mr. Gil-Leyva habitually left non-child resistant bottles of prescription medication within reach of the children in the past.  *See* [#36-1] at 5; *Minute Order* [#39] (finding that this request for admission was automatically deemed admitted).  Ms. Leslie also testified that he would oftentimes leave his prescriptions, including sleep aids and pain killers, within reach of the children, even though the bottles had non-child safe tops.  *Tr.* [#46] at 85.  More than once, she found their older child "holding a bottle of pills and shaking it."  *Id.*  She testified that Mr. Gil-Leyva's prescription use made his waking/sleeping pattern "erratic" and that his behavior became "pretty manic."  *Id.* at 93.

Ms. Leslie further testified that on "[t]he very few occasions [on] which he had been solely responsible for child care, [she] would return to find that diapers hadn't been changed.  On one occasion, he was in a narcotic induced sleep with the child awake and he was unrousable, sleeping, had taken sleeping medication, and was completely unaware."  *Tr.* [#46] at 78, 80.  She stated that, in total, she had left the children in his care "less than five times" for "maybe three hours maximum."  *Id.* at 94.  Ms. Leslie testified that the family had no car but only a work van, and that Mr. Gil-Leyva would put a child in the front seat and that on one occasion he simply used a tie-down strap in the back of the van for a child seat.  *Id.* at 88-89.

Ms. Leslie also testified that "[h]e took up hobbies such as soap making and shoe

making, and he would order sewing machines from the internet and disassemble them at the kitchen table," leaving parts all over the house including the kitchen and the living room. *Id.* at 81 (mentioning "[p]ower tools, solvents, screws, nails, glues, choking hazards"). "Several times, [Ms. Leslie] found [her] sons playing with items that were definitely a choking hazard, if not a burn hazard, because there were often chemical solvents." *Id.* at 81. Once, her "son grabbed a power saw which had been left plugging [sic] in in the kitchen, and turned it on," although "he was not hurt before [she] was able to run over and unplug it." *Id.* She testified that it was not abnormal for Mr. Gil-Leyva to leave power tools plugged in. *Id.* at 82.

Turning finally to Ms. Leslie's allegations that Mr. Gil-Leyva was physically abusive to her, Ms. Leslie testified that "[o]n a number of occasions, I was slapped [by Mr. Gil-Leyva] with an open hand, held, or shoved." *Tr.* [#46] at 72. She described "the most serious incident" as occurring when he was intoxicated and that he became angry with her and instigated an argument. *Id.* When she tried to leave, he pinned her down by kneeling on her shoulders, choked her with his hands, and spat in her face. *Id.* She broke a blood vessel in her eye and had some bruising on her neck, but there is no record of her having sought treatment for these injuries. *Id.* The choking incident happened once. *Id.* at 87. There was no testimony that the children witnessed this particular incident, but Ms. Leslie testified that Mr. Gil-Leyva would often slap her on her "back side very hard" in front of the children, and that when she told him that hurt, he would laugh about it. *Id.* at 86-87. He would also grab her arm if she tried to leave a room when he did not want her to. *Id.* at 87.

Mr. Gil-Leyva's version of these events differs, but the Court need not discuss his testimony in detail because the Court finds that Ms. Leslie failed to carry her burden

proving by clear and convincing evidence that Mr. Gil-Leyva presents a grave risk of harm to the children. In *Warren v. Ryan*, 2015 WL 3542681, at *4-7, the respondent described conduct that was clearly, on the whole, much more severe than the conduct discussed in this case, and yet that conduct did not meet the required "grave risk" standard. Here, the only asserted physical abuse of the children consisted of several spankings, which falls far below the standard of "grave risk." *See Warren*, 2015 WL 3542681, at *5 ("Even assuming the photos show some of the injuries that [the respondent] describes—marks left from disciplinary spankings, or hand prints left on a child's arm after a father roughly handles them—are not necessarily indicative of what might ordinarily be considered physical abuse: many a parent of a squirming, occasionally disobedient five-year old may, on occasion, grab the child by an arm and escort them somewhere else with sufficient force to leave marks on the child for brief period of time.").

Similarly, the only time the children saw alleged abuse of Ms. Leslie by Mr. Gil-Leyva was when he would slap her on her "back side very hard," which also falls far below the "grave risk" standard. *Warren*, 2015 WL 3542681, at *5 (stating that limited incidents of abuse directed at others and witnessed by the children are not sufficient); *see also id.* (stating that "instances of alleged abuse directed at a spouse, outside the presence of the children, are generally of little significance in assessing the existence of a grave risk to the children"). Regarding neglect, although Ms. Leslie certainly describes her former home with Mr. Gil-Leyva as an environment which may not be safe or healthy for children, there was no testimony about either child ever actually being hurt in the home in the years since their births. While this is certainly not dispositive, it is indicative that the conditions may not have been as terrible as alleged and counsels against a finding of "grave risk." Even if

those conditions were as bad as alleged, however, the Court, as described below, is not ordering the children to be returned to Canada to live in the same household as their father.

Accordingly, because Mr. Gil-Leyva has successfully demonstrated a prima facie case of wrongful retention, the children must be returned to Canada because Ms. Leslie has not successfully established one of the defenses set forth in the Hague Convention. *See, e.g.*, *Warren*, 2015 WL 3542681, at *8.

**C.    Remedy**

Given these holdings, the Court turns to the question of the appropriate remedy. Article 12 of the Hague Convention provides that "[w]here a child has been wrongfully removed . . . the [court] shall order the return of the child forthwith." As stated in *Warren*, 2015 WL 3542681, at *7:

> Notably, the "return" in question is the return of the child to a place, not to a person: as the Convention's Preamble states, it is designed "to establish procedures to ensure their prompt *return to the State* of their habitual residence." (Emphasis added). This is consonant with the understanding that the Convention is intended to preserve the rights of the state of the children's habitual residence to decide questions of custody. *See Friedrich*, 78 F.3d at 1063-64; *see also* Convention, Art. 19 ("A decision under this Convention concerning the return of the child shall not be taken to be a determination on the merits of any custody issue"). Thus, the remedy for a wrongful removal is simply to restore the children to the jurisdiction of their place of habitual residence, and that jurisdiction shall then decide how to apportion custody among the parents. *Id.*

"It is necessary to make this observation because parties often misunderstand the effect of a decision favorable to a petitioning parent." *Warren*, 2015 WL 3542681, at *7. Although the Court is compelled to order that the children be returned to Canada promptly, "nothing in the Hague Convention or ICARA authorizes the Court to dictate who should exercise custody over the children during their transportation or even upon their arrival." *Id.* To the

extent permitted by Canadian law, Ms. Leslie may, consistent with this Order of the Court, accompany the children back to Canada and take up her own residence with them there, continuing to exclude Mr. Gil-Leyva from access to the children[7] while simultaneously making her case to the appropriate Canadian court that Mr. Gil-Leyva's asserted abuse and other conduct should preclude him from even partial custody; conversely, Mr. Gil-Leyva may seek an order from a Canadian court that he be provided immediate access to the children. As another alternative, Ms. Leslie may theoretically return the children to Canada and place them in the custody of family, a friend, or foster care, rather than turning them over to Mr. Gil-Leyva, at least until Canadian authorities determine how custody is to be apportioned. Further, nothing in this Order requires the children to even live in the same town as Mr. Gil-Leyva. While some of these options may signal an escalation in hostilities between the parents, the Court notes them simply to emphasize that the Hague Convention addresses only the return of the children to a jurisdiction and not to a particular person.

The Court is sympathetic to the fact that Ms. Leslie is not a Canadian citizen and that, as she testified at the hearing, the court system in Canada could take many months to adjudicate these issues and finally resolve any custody matters. *Tr.* [#46] at 96-98. However, the Court is constrained by the parameters of the Hague Convention to hold that it is the Canadian court system, and not the American court system, that must make those determinations. HMG and HFG must be returned to Canada forthwith to allow those proceedings to begin. The Court will not, and may not, speculate as to what custodial

---

[7] The Court notes that on December 16, 2016, a Colorado court entered a permanent injunction order against Mr. Gil-Leyva with respect to Ms. Leslie and both children. *Ex. L to Am. Compl.* [#22] at 229-32.

arrangements are appropriate.[8] *See Warren*, 2015 WL 3542681, at *8; 22 U.S.C. § 9001(b)(4) ("The Convention and this chapter empower courts in the United States to determine only rights under the Convention and not the merits of any underlying child custody claims.").

### IV. Conclusion

IT IS HEREBY **ORDERED** that Petitioner Hector Gil-Leyva's Amended Complaint [#22] seeking return of his children to Canada is **GRANTED**.

IT IS FURTHER **ORDERED** that Respondent Ms. Leslie shall make travel arrangements to ensure that HMG and HFG are returned to Canada **no later than twenty-eight (28) days after entry of this Order**.

IT IS FURTHER **ORDERED** that Respondent Ms. Leslie shall file a Notice of Compliance with this Order **no later than seven (7) days after the children are returned to Canada**.

IT IS FURTHER **ORDERED** that each party shall bear his or her own costs in this matter.

IT IS FURTHER **ORDERED** that this case is **closed** in its entirety.

Dated: April 17, 2018

BY THE COURT:

Kristen L. Mix
United States Magistrate Judge

---

[8] However, the Court notes that nothing in this Order should be construed as suggesting that a Canadian court of appropriate jurisdiction may not determine that the children may return to the United States with their mother.